## Case No. 8,607.

### LUPTON v. JANNEY.

### [5 Cranch, C. C. 474.] [1]

Circuit Court, District of Columbia. Oct. Term, 1838.[2]

EXECUTORS AND ADMINISTRATORS — SETTLEMENT OF ACCOUNT BY THE ORPHANS' COURT—CONCLUSIVENESS — JURISDICTION OF ORPHANS' COURT— JURISDICTION OF CIRCUIT COURT—SUIT AGAINST INSOLVENT DEBTOR OF ESTATE — OPENING ACCOUNT—BAR—LAPSE OF TIME—ACQUIESCENCE.

1. The settlement of an administration account by the orphans' court is conclusive upon this court as against distributees and residuary legatees, except by appeal; although not conclusive against creditors upon a question of devastavit or plene administravit. It is a part of the ordinary duty of the orphans' court to ascertain and distribute the surplus, or residuum of a deceased person, and, for that purpose, to settle the administration account. The jurisdiction of that court in that matter is original, peculiar, and exclusive. An original bill, in the circuit court, to compel an executor to account with a residuary legatee, and not necessarily connected with any other ground of equitable jurisdiction, is a bill asking that court to do what originally belongs exclusively to the orphans' court to do. The circuit court has not jurisdiction of such an original bill.

2. A court of equity will not lend its aid to enforce an unconscientious claim.

3. It is a matter within the discretion of an executor whether he will incur the expense of a suit against a known insolvent debtor of the estate.

4. Mere lapse of time is not alone a bar to the opening of an executor's account; but, long acquiescence in the settlement of an administration account may make it against conscience to seek to open it.

[See note at end of case.]

Bill in equity to open an executor's accounts after they had been settled more than twelve years in the orphans' court.

The plaintiff [Ann Lupton] was the widow and residuary legatee of David Lupton, junior, and the defendant [Phineas Janney] was his acting executor. The other executors were David Lupton, the father of the testator, and John McPherson, the father of the plaintiff. They all qualified, but as the defendant was the only one of the three residing in Alexandria, he took upon himself the whole burden of the administration. The bill states that the defendant rendered an inventory and sundry accounts to the orphans' court, by which it appeared that the estate was insolvent, and that the defendant was in advance for it. That the last account was rendered on the 5th of January, 1821. That the testator died in 1814. That if the accounts had been settled upon proper principles the estate would have been not only solvent, but a very handsome residuum would have remained to the plaintiff as residuary devisee. That the defendant should

1 [Reported by Hon. William Cranch. Chief Judge.]

2 [Affirmed in 13 Pet. (38 U. S.) 381.]

be charged with several debts due to the testator's estate which he might and ought to have collected; namely, $4,083.50, due by John McPherson & Son; $263.50 due by the same to Abijah Janney & Co., and assigned to the testator; $225, for plaster due by the same, and $140 due by the same to the testator upon open account; $223, due by Thomas Neil; and $4,959.43, which he charged as paid to Peter Saunders "without sufficient or legal evidence that the money was in fact due." That there might be many other debts due to the testator which have been lost by the defendant's negligence, as he had returned to the orphans' court no list of debts, either sperate or desperate. The bill then prays that the defendant may render a due list of debts due to the testator at the time of his death; that the administration accounts may be all opened, and that a new and full account may be ordered to be taken; and it also prays for general relief. The bill was filed at May term, 1833. The defendant, "saving to himself the benefit of exception to the jurisdiction of the court on the matter stated in the complainant's bill," and to the many errors, &c., answers, and among other things, admits that he returned the inventory and settled the accounts with the orphans' court, as stated in the bill; and that the plaintiff was not present at, nor summoned to attend at the said settlements; but avers that they were legally made before a court having full jurisdiction of the matter, in the due course and regular exercise of its jurisdiction; and he relies on the said settlements in bar of the jurisdiction of this court, as a court of original jurisdiction, in the case stated by the plaintiff, in the same manner as if the same were specially pleaded. The defendant not waiving this defence, further answered, among other things, that the said Peter Saunders was a fair and bona fide creditor of the testator to the full amount of all payments made to him by the defendant as executor, after deducting all proper credits. He admits that no security was taken on the sale of the flour to John McPherson & Son; but denies that he is chargeable with negligence on that account. He states that the firm of John McPherson & Son was composed of John McPherson, the plaintiff's father, who was one of the executors, and Daniel McPherson, her brother. That she had given the executors a written authority to sell the real and personal property either at public or private sale, as they might deem most advantageous, a copy of which is exhibited. That when the flour was sold to John McPherson & Son, they were in good credit, and engaged in extensive business in Alexandria. That the flour was in store at the death of the testator, in November, 1814. That the sale was made on the 17th of April, 1815, on a credit of six months. That in May, 1816, the defendant succeeded in obtaining the note of John McPherson & Son, for $1,000, on account of the sale, with

the said Peter Saunders as indorser; but they always refused to give their notes for any further amount, contending that the testator's estate was indebted to them in an amount equal, or nearly so, to the balance due for the flour. That in settlement with Saunders he was charged with the note of $1,000, and the testator's estate had credit for it. As to the note of John McPherson & Son for $263.50, and Thomas Neil's note for $223, he says they were taken by Peter Saunders, one of the firm of Abijah Janney & Co., (which firm was composed of Abijah Janney, the said Peter Saunders, and the testator, David Lupton, jr.,) for one-third of the debts due to that firm by the said John McPherson & Son, and the said Thomas Neil respectively, and were delivered by Saunders to the defendant, (but not until March, 1817,) as the testator's share of the said debts; and that the said John McPherson & Son, and the said Thomas Neil were insolvent when the said notes were taken, and the defendant did not think himself warranted in incurring the expense of suits against them. That the defendant has fully accounted for all the plaster belonging to the estate which came to his hands. That since his final account was rendered, the said John McPherson and Peter Saunders, have departed this life, by which the defendant is deprived of the benefit of their testimony. That the defendant did return to the orphans' court a list of debts due to the testator's estate, a copy of which is exhibited. That as to the debt of $140 by open account, supposed to be due from John McPherson & Son, they would only allow it as a discount to their claim against the testator's estate, and the defendant had no evidence but their qualified admission. And that Abijah Janney was also insolvent.

In March, 1837, the plaintiff filed a supplemental bill charging that the defendant had obtained letters testamentary also in Fairfax county, in Virginia, and sold property there to the amount of $8,000 or $9,000, of which he had rendered no account, &c. The answer of the defendant to this supplemental bill, avers that he had, long since, rendered his account of that administration to the county court of Fairfax which has been confirmed by that court and recorded; and also that his settlements of accounts with the orphans' court of Alexandria embrace the Virginia assets, and present a full statement of both administrations. He also relies upon the act of Virginia of the 8th of March, 1826, "for the limitation of actions against persons acting in a fiduciary character, and their sureties, and for other purposes," as a complete bar to any opening of that Virginia account. And he relies also on the lapse of time as to the whole matter of the accounts. He also states that since his answer to the original bill, circumstances have come to his knowledge which induce him to believe that John McPherson & Son

were entitled to the credit which they claimed against their purchase of the flour, viz.: that he (this defendant,) had obtained the original note of the testator to John McPherson & Son for $1,000, dated 11 mo. 12, 1814, a few days before the testator's death, which note had upon its face their order to credit the proceeds to the account of the testator. That the note was discounted by the Bank of Potomac for the use of the testator, and the proceeds placed to his credit in that bank; and that it was taken up by the friend and nephew of John McPherson, and therefore was a proper set-off against the flour. By his will, the testator devised all the residue of his estate, after payment of his debts and those of the firm of Abijah Janney & Co., of which he was a partner, to his widow, the plaintiff. The will is dated 24th November, 1814, and was proved on the 2d of December, 1814. The accounts of the defendant settled in the orphans' court, and produced by the plaintiff, show that the defendant has accounted for all the assets which came to his hands.

A number of depositions were taken, by which it appeared that John McPherson & Son were in good credit and doing an extensive business at the time of their purchase of the flour, but that they stopped payment on the 7th of June, 1816. The evidence confirmed and corroborated the defendant's answer.

CRANCH, Chief Judge, after stating the substance of the bills, answers, and evidence, delivered the opinion of the court, as follows:

The first question which occurs in this case is, whether this court has original jurisdiction of a bill by a residuary legatee to surcharge and falsify accounts of an executor, stated, settled, and allowed in the orphans' court. Upon this question, I have had considerable doubt; but upon looking into the case of Beatty v. Maryland, 7 Cranch [11 U. S.] 281, I am inclined to the opinion that the settlement of the accounts by the orphans' court, is conclusive upon this court, as against distributees and residuary legatees; although not against creditors upon a question of devastavit, or plene administravit. Mr. Justice Duvall, in that case said, "the account was only binding upon the representatives of the estate, the distributees; and they might still open it in the general court. But the creditors are no parties to the settlement of the accounts, and cannot be bound by it." The question, in that case, arose upon the issue of devisavit vel non. The bill, in the present case, calls upon this court to do that which the orphans' court, upon a bill or petition, had the power to do, and which it was the proper business of that court to do, viz., to open the account so far as to permit the residuary legatee to surcharge and falsify. It is the proper function of that court to see that the residuum of the estate is properly distribu-

ted; and its original jurisdiction of that matter seems to be exclusive. By the act of congress of the 27th of February, 1801, § 12, (2 Stat. 103,) the judge of the orphans' court, in each county in this district, has all the powers, and is to perform all the duties then exercised and performed by the judges of the orphans' courts in Maryland; and an appeal is given to this court, "who shall therein have all the powers of the chancellor of that state."

By the Maryland law of 1798 (chapter 101, subc. 15, § 1), the orphans' court is established, "for the purpose of taking probate of wills, granting letters testamentary, and of administration; directing the conduct, and settling the accounts of executors and administrators, securing the rights of legatees, superintending the distribution of the estates of intestates, securing the rights of orphans and legatees, and administering justice in all matters relative to the affairs of deceased persons according to law." And by section 12, it is enacted, that "the orphans' court shall have full power, authority, and jurisdiction, to hear, examine, and decree upon all accounts, claims, and demands existing between wards and guardians; and between legatees, or persons entitled to any distributable part of an intestate's estate, and executors and administrators; and may enforce obedience to, and execution of their decrees, in the same ample manner as the court of chancery may." This is a peculiar and exclusive original jurisdiction. An original bill, in this court, to compel an executor to account with a residuary legatee, and not necessarily connected with any other ground of equitable jurisdiction, is a bill asking this court to do that which originally belongs exclusively to the orphans' court to do. It is a part of its ordinary duty to ascertain and distribute the surplus, or residuum of the estate, and for that purpose to settle the administration account. When that account necessarily and incidentally comes before this court, either as a court of equity, or of law, in a suit, of which this court has original jurisdiction, the ex parte settlement by the orphans' court would probably be taken to be prima facie correct, but the opposing party would have a right to surcharge and falsify, and the court would open it for that purpose; but if the settlement had been made by the orphans' court, in a contested case between the same parties, it would probably be deemed by this court conclusive until it should be reversed upon appeal. But in an ex parte settlement without notice to the residuary legatee, he could not appeal; for an appeal can be taken only by a party to the contest, and if there be no contest, there can be no appeal. But he might call the executor before the orphans' court, by a bill or petition, charging errors in the accounts as settled, and praying that he may be permitted to surcharge and falsify the accounts, &c., and from the decree of the orphans'

court, upon such a bill or petition, either party would have a right to appeal to this court. If, however, the executor's accounts should not have been settled by any definitive decree or order of the orphans' court, they would be entirely open, and the residuary legatee might file his bill or petition in that court for a settlement of the whole account; upon which proceeding the whole account would be open, and must be supported in toto by proper vouchers, in the due course of administration. This seems to me, from the best consideration which I have been able to give the subject, to be a correct view of the case; and I am, therefore, led to the conclusion that this court has not jurisdiction of an original bill to revise a settlement of an executor's account made by the orphans' court; or to call the executor before us, to render an original account. I do not mean, however, to say that if the accounts of an executor, settled ex parte in the orphans' court, without notice, should incidentally come before this court in a suit of which this court has original jurisdiction, and the correctness of that settlement should be questioned, this court would not permit the opposing party to surcharge and falsify. All I mean to say, is, that the settlement of an administration account is not an original ground of jurisdiction of this court, either as a court of equity, or of law.

The only ground of jurisdiction asserted in the present bill, is error in the settlement of the executor's account, by the orphans' court; and the alleged errors are in not charging the executor with legal laches in not pushing his legal rights to the utmost extent of the law. If the decree or order of the orphans' court be, for that cause, erroneous, we think that the plaintiff's remedy was either an appeal, or a bill or petition to open the settlement. But if we err in this opinion, and if we are bound to take cognizance of the cause, we think that, under the circumstances of this case, it is unconscientious in the plaintiff to assert what she supposes to be her legal right. And if she cannot, with a good conscience, assert her claim, a court of equity ought not to lend its aid to enforce it. The facts of the case, as we collect them from the evidence, are these. All the parties concerned in this suit were nearly connected by consanguinity or affinity; and had confidence in each other. The plaintiff was the daughter of John McPherson, and sister of Daniel McPherson, who constituted the mercantile firm of John McPherson & Son. Her husband, the testator, was the brother of the wife of his executor, the defendant, Phineas Janney. Abijah Janney, mentioned in these transactions, was the partner of the testator in the firm of Abijah Janney & Co., the other partner being Peter Saunders, also mentioned in the transactions. John McPherson, one of the executors, was the father-in-law, and the other executor, David Lupton, was the father of the testator. John McPherson, David Lupton,

and Phineas Janney, all qualified as executors; but as Phineas Janney was the only one of them who resided in this district, the other two seem to have left the whole management of the estate to him. The testator died in the last week in November, 1814. The greater part of his personal estate consisted of about 1200 barrels of flour, which, in consequence of the interruption of commerce by the war, was appraised at from $3 to $3.50 per barrel. In April, 1815, this flour was sold for a little more than $4,080, at six months' credit, by the acting executor, the defendant, Phineas Janney, to John McPherson and Son, who were merchants, dealing in flour, and then in good credit. This sale must, of course, have been known to the defendant's co-executor, John McPherson, the purchaser; and it can hardly be doubted that it was known also to the other executor, David Lupton, the father of the testator. In the defendant's letter to John McPherson, dated 12 mo. 21, 1816, principally upon another subject, a copy of which is annexed to the defendant's letter to David Lupton, dated 12 mo. 30, 1816, he mentions incidentally, and as a matter well known, "the amount of the flour sold John McPherson & Son, yet unpaid for," and says, "perhaps some arrangement might be made for a part of the money due for the flour, to be secured to the widow for what may be coming to her on settlement of the estate."

It may also be fairly inferred from the evidence, that the plaintiff, who is the residuary legatee, knew and approved the sale of the flour to her father and brother. The defendant, in his letter to her, dated 12 mo. 29, 1816, refers her to his letter to her father inclosing the letter to John McPherson, in which he speaks of the flour sold to John McPherson & Son, then remaining unpaid for, as a matter already well known, and says: "I wish thee most particularly to see the whole letter, in order that thee may know how the business stands." And again, he says: "In consequence of the will of D. Lupton not stating expressly whether the sale of his personal and real estate should be at public or private sale, I would thank thee to sign the inclosed certificate or memorandum, authorizing us to sell either at public or private, as the judge of the orphans' court says he would prefer having it for his authority." It is admitted that this certificate was antedated so as to cover the sale of the flour, and was signed by the plaintiff, (who was then living with her father, John McPherson, in Jefferson county, in Virginia.) and returned to the defendant. This authority, thus antedated and signed by her with a full knowledge of the sale, and that the money was yet unpaid, justifies an inference that the sale of the flour was originally made to her father and brother, with her knowledge and consent, or that she afterwards assented to it. In either case it is now unconscientious in her, after they have become insolvent, to attempt to throw the loss upon the defendant because he did not pursue her father and brother with the utmost rigor of the law. Whatever right the creditors might have had to charge the defendant at law with that loss, we think that the plaintiff, under the circumstances of the case, cannot so charge him in equity, with a good conscience.

But there are several other charges in the bill. The first is, that the defendant's commissions were increased thirty-five dollars and twenty-eight cents by unnecessary cross-entries in the accounts settled by the orphans' court. The bill does not explain this charge by reference to the particular cross-entries alluded to; but it is supposed that it refers to a cross-entry of sixty-four dollars credited to the estate for the testator's interest in a carriage sold to Peter Saunders, one half of which carriage he owned before, the value of which interest was allowed by Peter Saunders in the settlement of his claim against the estate of the testator. But it appeared that he (Saunders) had paid for repairs upon the carriage, which reduced the value of the testator's interest to fifty-two dollars; so that the error is in having charged commissions on sixty-four dollars instead of fifty-two dollars; the difference being ninety cents. The other cross-entry is in crediting the estate with four hundred and six dollars and fifty cents, being the amount of goods taken by the plaintiff at the inventory prices, and charging the estate with the same amount advanced to her on account of her residuary legacy. This charge against the estate ought not regularly to have been made in the account settled in the orphans' court; and the creditors might object to it at law, but this plaintiff, who has received the amount, cannot, in equity.

The next charge is, that the defendant paid money to Peter Saunders, without having sufficient evidence that the estate was indebted to him. If the debt was in fact due to him, it is immaterial whether the defendant had or had not sufficient evidence of it at the time of payment. If the bill is to be understood as charging the defendant with paid money not due, the answer denies it positively, and avers that the said Peter Saunders was a fair and bonâ fide creditor of the estate to the amount of the payments made to him by the defendant, after deducting the fifty-two dollars for the carriage, and one thousand dollars for the note of John McPherson & Son indorsed by him, and all other credits. The answer, in this respect, being responsive to the bill, must be taken to be true, and removes the whole ground of this charge.

The next is, that the defendant neglected to collect the money due upon John McPherson & Son's note for $263.50. It appears by the evidence, that at the time this note was given or when it was delivered to the defendant, by Abijah Janney & Co., of which firm the testator was a partner, John McPherson & Son were insolvent; and the defendant, in

his answer, avers that he did not think himself warranted in incurring the expenses of a suit upon it. The same may be said of Thomas Neil's note for $223, and of the open and disputed account, against John McPherson & Son, for $140.

The next charge is for not accounting for eleven and a quarter tons of plaster. This item is founded upon a paper, in the handwriting of the defendant, produced in evidence by the plaintiff, purporting to be a statement of the funds to meet the judgment in favor of the Bank of Alexandria; one item of which statement is, "eleven and a quarter tons plaster, due from John McPherson & Son, at twenty dollars per ton, amount of appraisement, two hundred and twenty-five dollars." The paper shows that the plaster was not on hand, but was a debt due, by John McPherson & Son, in plaster. It rested, therefore, upon the same ground as the balance due upon the sale of the flour, and the open account; and John McPherson & Son denied that any thing was due. beyond the one thousand dollars for which they gave their note, with Peter Saunders's indorsement, and which was paid by him in the settlement of his claim against the estate. The fact of the insolvency of John McPherson & Son being proved, it was a matter within the discretion of the defendant, as executor, whether he should incur the expenses of a suit against them.

The next charge is, that the defendant had not accounted with the county court of Fairfax county, in Virginia, for the property received by him in that county. This charge is positively denied in the answer, and appears to have been abandoned in the argument.

The defendant, in his answer to the supplemental bill, relies upon the lapse of time as a bar to the opening of the accounts, at this time, his final account having been settled with the orphans' court in January, 1821, and the plaintiff's bill not having been filed until May, 1833, a period of more than twelve years, and more than eighteen after the sale of the flour. We are of opinion, however, that the mere lapse of time is not, alone, a bar to the opening of an executor's account. But the long acquiescence of the plaintiff in the settlement of the accounts, is material to the question, whether the plaintiff can, with a good conscience, now come into a court of equity to charge the defendant with the losses mentioned in the bill. This, with the other circumstances already noticed, does affect the conscience of the plaintiff, and renders it proper that this court, as a court of equity, should refuse her its aid. The bill must be dismissed with costs.

Affirmed by the supreme court of the United States (13 Pet. [38 U. S.] 381) upon the ground that the lapse of time was a bar to the relief sought.